**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO:**

**GENARIS HASTON,**

     **Plaintiff,**

**v.**

**GOLD COAST FEDERAL CREDIT UNION,
TRANS UNION, LLC, EXPERIAN
INFORMATION SOLUTIONS, INC., and
EQUIFAX INFORMATION SERVICES, LLC.**

     **Defendants.**

_____/

## PLAINTIFF'S COMPLAINT
### JURY DEMAND

1.     Plaintiff, GENARIS HASTON ("Plaintiff" or "Mr. Haston") brings this action against Gold Coast Federal Credit Union ("Gold Coast"), Trans Union LLC, Experian Information Solutions, Inc., and Equifax Information Services, LLC for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* (hereinafter "FCRA") and as grounds thereof would allege as follows:

### JURISDICTION AND VENUE

2.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

3.     Venue here is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in Palm Beach County, Florida.

### PARTIES

4.      Plaintiff is a natural person who, at all times relevant to this action was a resident of Palm Beach County, Florida.

5.      Gold Coast is a credit union located in the state of Florida with its principal place of business located at 2226 S Congress Avenue, Palm Springs, FL 33406. Gold Coast provides multiple services to consumer such as consumer loans, home loans, checking accounts, and savings accounts.

6.      Defendant, Transunion LLC ("Trans Union") is a limited liability company incorporated under the laws of the State of Delaware, whose members are citizens of the state of Illinois. Trans Union is authorized to do business in and regularly conducts business in the State of Florida and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

7.      Defendant, Experian Information Solutions, Inc. ("Experian") is an Ohio corporation incorporated under the laws of the State of Delaware. Experian is authorized to do business in the State of Florida and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

8.      Defendant, Equifax Information Services, LLC ("Equifax") is a Georgia limited liability company incorporated under the laws of the State of Delaware. Equifax is authorized to do business in the State of Florida and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

9.      Trans Union, Experian, and Equifax shall collectively be referred to as the "Credit Reporting Agencies" or the "CRAs."

## STATUTORY FRAMEWORK

### The Fair Credit Reporting Act

10.      The Fair Credit Reporting Act, 15 U.S.C. §1681 *et. seq.,* was originally enacted in 1970 for the purpose of regulating the collection, dissemination, and use of consumer credit information.

11.      Congress found that "[i]nnacurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. §1681(a)(1).

12.      "The aim of the Fair Credit Reporting Act is to see that the credit reporting system serves the consumer as well as the industry. The consumer has a right to information which is accurate; he has a right to correct inaccurate or misleading information; he has a right to know when inaccurate information is entered into his file; he has a right to see that the information is kept confidential and is used for the purpose for which it is collected; and he has a right to be free from unwarranted invasions of his personal privacy." The Fair Credit Reporting Act seeks to secure these rights." Hearings on S. 823 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking and Currency, 91st Cong. 2 (1969).

13.      A "furnisher of information" provides information about consumers' credit history to credit reporting agencies. 15 U.S.C. §1681s-2.

14.      "Furnishers of information" under the FCRA, pursuant to 15 U.S.C. §1681s-2(b) to conduct a reasonable investigation into each of the written disputes that it receives from

the credit reporting agencies. *See also Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1302 (11th Cir. 2016).

15.     Congress also found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "[t]here is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(3), (4).

16.     The FCRA requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. 15 U.S.C. § 1681e(b). If a consumer disputes information contained in their credit report, the FCRA requires a credit reporting agency to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller."15 U.S.C.S. § 1681i(a)(1)(A).

17.      In performing the reinvestigation, the FCRA requires a credit reporting agency to "review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information."15 U.S.C.S. § 1681i(a)(4).

18.     If the disputed information is inaccurate or incomplete or cannot be verified, the consumer reporting agency "shall…(i)  promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the

reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer." 15 U.S.C. § 1681(a)(5)(A)(i),(ii).

19.     The FCRA provides a private right of action against any person that violates the provisions of the FCRA. 15 U.S.C. §§ 1681o, 1691n.

20.      If the violation is negligent, the FCRA allows the consumer to recover actual damages (§ 1681o(a)); however, if the violation is willful, the consumer may recover any actual damages or statutory damages from not less than $100.00 and not more than $1,000. § 1681n(a).

21.     Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.      credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii.     employment purposes; or
> >
> > iii.    any other purpose authorized under section 1681b of this title.
>
>    15 U.S.C. § 1681a(d)(1).

22.     The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

## **FACTUAL ALLEGATIONS**

### *Credit Risk Scores aka 'Credit Scores'*

23.     The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting

agencies. *See* https://www.myfico.com/credit-education/credit-scores (last visited December 7, 2021).

24.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

25.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau*, Supervision and Examination Manual, Version 2* (October 2012), p. 99, archived at https://perma.cc/JF32-RFAA     http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination- manual-v2.pdf  (last accessed on December 7, 2021).

26.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

27.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score        (last     accessed December 7, 2021).

28.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

29.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

30.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

31.     The Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report *archived at* https://perma.cc/9TQN-S5WP (last visited December 7, 2021).

*The CDIA Metro 2 Credit Reporting Standards*

32.     The reporting of consumer credit information, by CRAs and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers by giving

them access to loans and bank products that they need. *See* https://www.cdiaonline.org/for-consumers/credit-reporting-overview/ (last visited December 7, 2021).

33.     Moreover, the significance of credit reporting and the value attached to one's "credit in this day and age is one of his most valuable assets and without it, a substantial portion of the American people would be without their homes, washing machines, refrigerators, automobiles, television sets, and other mechanical paraphernalia that are now regarded as necessities of life." *Am. Fire & Cas. Co. v. Davis*, 146 So. 2d 615, 619 (Fla. 1st DCA 1962)."

34.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

35.     Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

36.     On May 20, 2015, Ohio Attorney General Mike DeWine and thirty (30) other state attorneys general announced a national settlement ("The Settlement") with the CRAs. *Attorney General DeWine Announces Major National Settlement with Credit Reporting Agencies*,     Ohio     Att'y     Gen.     (May     20,     2015), https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-S , last visited December 7, 2021.

37.     The Settlement implemented numerous reporting standards, including the Metro 2, data reporting format. *See* Assurance of Voluntary Compliance/Assurance of

Voluntary Discontinuance, *In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and TransUnion L.L.C.,* § IV (E)(2) (May 20, 2015).

38.     To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

39.     The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

40.     If the standardized methods proscribed by the CDIA are not followed, FCRA certification can be revoked for failure to adhere to such standards.

41.     In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. See, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/   (last accessed December 7, 2021).

42.     The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete, and timely data, and has developed the Metro 2 standards. *See* https://www.cdiaonline.org/metro-2/ (last visited December 7, 2021).

43.     In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard")

for reporting consumer accounts that is "designed to standardize a wide range of credit information while complying with federal laws and regulations for credit reporting." *Id.*

44.     15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

45.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

46.     The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure compliance with their respective duties to maintain complete and accurate information under the FCRA.

47.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

48.     The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

49.     As an integral aspect of its duties under the FCRA, Gold Coast is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

50.     At all times relevant hereto, Gold Coast adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

51.     Furthermore, at all times relevant hereto, Gold Coast incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

52.     As an integral aspect of its duties under the FCRA, Trans Union is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Trans Union produces reports; the requirement to maintain reasonable procedures extends to Trans Union's handling and reinvestigation of disputed information.

53.     At all times relevant hereto, Trans Union adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

54.     At all times relevant hereto, Trans Union has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

55.     As an integral aspect of its duties under the FCRA, Trans Union is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Trans Union produces reports;

the requirement to maintain reasonable procedures extends to Trans Union's handling and reinvestigation of disputed information.

56.     At all times relevant hereto, Experian adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

57.     At all times relevant hereto, Experian has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

*National CRAs and Furnishers Communicate Consumer Disputes and Responses via the E-Oscar Reporting Platform*

58.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

59.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser- based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

60.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See http://www.e-oscar.org/ (last accessed December 7, 2021).

61.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes.  *Id.*

62.     The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e- OSCAR.

63.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

64.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. *See https://www.e-oscar.org/implementation/about-us* (last accessed December 7, 2021).

65.     Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

66.     Trans Union and Experian each require data furnishers that report to them respectively to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, https://www.transunion.com/data-reporting/support-teams  (last accessed December 7, 2021).

*Viewers of Credit Reports Presume Compliance with the Metro 2 Standards; Departures are, Therefore, Inherently Misleading*

67.     The CRRG and the Metro 2 guidelines have been uniformly adopted across the credit reporting industry.

68.     All entities which contribute to consumer reports have agreed to comply with the Metro 2 guidelines, which are "accepted by all consumer reporting agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

69.     Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer report will view the report in the light of the guidelines, presuming that the information reported complies with industry standards.

70.     For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are presumed to comply with Metro 2 standards.

71.     As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards and interpret that information accordingly.

72.     Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

73.     Defendants have actual knowledge that entities reviewing consumer credit reports presume that Defendants have complied with the Metro 2 standards.

74.     Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the probability of a reported item being

false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

75.     The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

76.     Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

*Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

77.     As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

78.     Because consumer credit information changes monthly, failure to update that information monthly, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

*The Consumer Information Indicator*

79.     The Consumer Information Indicator ("CII"), is a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

80.     Furnishers and CRAs are required to update the CII code when an Underlying Bankruptcy for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

81.     The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

82.     While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

83.     This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

84.     The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

85.     These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

86.     Since the industry standard requires disclosure of a pending bankruptcy, the absence of such a disclosure inherently misleads a viewer into believing that the account is not included in bankruptcy.

87.     Relatedly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely

indicate that the account is subject to bankruptcy or discharge and suppress the consumer's positive history of making payments toward the account.

*Reporting of Accounts with an Active, Confirmed Chapter 13 Bankruptcy, Under Metro 2*

88.     Upon confirmation of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report on an included account for any debtor included in the bankruptcy as follows:

a.      A **Consumer Information Indicator** ("CII") of "D" (or blank to maintain a "D" which was previously reported), indicating that the account is subject to an Underlying Bankruptcy for Chapter 13 bankruptcy;

b.      An **Account Status Code** reflecting the status at time of the Underlying Bankruptcy;

c.      A **Payment History** of "D" (indicating "no history available") for each month since the filing of the bankruptcy, plus actual history for prior months;

d.      An **Amount Past Due** of zero;

e.      A **Current Balance** reflecting the current balance as provided for under the terms of the Chapter 13 plan, rather than the original contract;

f.      **Terms Duration & Terms Frequency** which incorporate any changes the contract terms provided for under the Chapter 13 plan;

g.      The **Scheduled Monthly Payment Amount** reflecting the scheduled payment amount under the Chapter 13 plan, rather than under the original contract; and

h.      A **Date of Account** Information of the current month's date (increasing with each month's reporting).

CRRG, FAQ 28(a)-(b), at 6-27.

89.     Therefore, a secured debt, such as a car loan would show a CII indicator of "D" if the consumer is making payments on the subject account through a Chapter 13 plan. CRRG, FAQ 29, at 6-40.

90.     If the account is not included in the Chapter 13 plan, Metro 2 requires furnishers and CRAs to leave the CII code blank. CRRG, FAQ 28(b) at 6-30.

*Plaintiff's Bankruptcy case*

91.     On February 21, 2017, Plaintiff filed a Chapter 13 Underlying Bankruptcy for Bankruptcy in the United States District Court for the Southern District of Florida, Case No. 17-12051-MAM (hereinafter "Underlying Bankruptcy").

92.     The Underlying Bankruptcy included specific secured and unsecured debts Plaintiff had with various creditors.

93.     On March 21, 2017, Plaintiff submitted his Initial Schedules, which includes a "Summary of Your Assets and Liabilities". *See* Underlying Bankruptcy at [DE 16].

94.     One of his secured debts was an auto loan from Gold Coast. *See* Underlying Bankruptcy [DE 16, pg. 11 of 32].

95.     On January 11, 2018, Plaintiff submitted his ninth amended Chapter 13 Bankruptcy Plan (hereinafter "Amended Plan"), which listed his auto loan under "Direct Payments." *See* Amended Plan [DE 100, pg. 3 of 4].

96.     The "Direct Payments" section states in relevant part: "The debtor(s) elect to make payments directly to each secured creditor listed below . . ." *Id.*

97.     On March 22, 2018, Plaintiff's Amended Plan was confirmed by court order. *See* Underlying Bankruptcy [DE 111].

98.     On September 29, 2020, Plaintiff received an order of discharge in connection

with his Underlying Bankruptcy under 11 U.S.C. §1328 (hereinafter "Discharge"). Plaintiff's

Discharge is *attached hereto as part of Composite Exhibit "A."*

*Plaintiff's Online and Telephone Disputes*

99.     Over the next several months after Mr. Haston's discharge, Mr. he began

reviewing any available credit information from multiple sources associated with the CRAs to

see how his Gold Coast Auto Loan was appearing.  Between March 4 and March 6, 2021, Mr.

Haston was reviewing his credit information and noticed his auto loan with Gold Coast

appeared as follows:

> a.     Trans Union related source – Gold Coast Federal CU #410244****
> appearing under "Adverse Account"[1]; and
>
> b.     Experian related source – Gold Coast Fed CR Unio #41204XXXX with
> a Payment Status of "Debt included in or discharged through Bankruptcy
> Chapter 13," "BK" appearing in "Payment history" for September 2020.

100.    On or about March 6, 2021, Mr. Haston initiated an online dispute through an

Experian related source, which generated an ACDV that was sent from Experian to Gold Coast

to dispute the status of the account as being included in the Underlying Bankruptcy. After the

initial ACDV was generated, Gold Coast inaccurately verified that Mr. Haston's auto loan was

discharged, and reinvestigation results were provided to Mr. Haston from Experian. A true and

correct copy of the March 6, 2021, reinvestigation results from Experian are *attached hereto*

*as part of Composite Exhibit "A."*

101.    On May 25, 2021, Mr. Haston applied for a credit card through JP Morgan

Chase Bank and was denied. Relatedly, a "Hard Inquiry" appears on Mr. Haston's Experian

---

[1] Mr. Haston also has a line of credit with Gold Coast, which was discharged in his Underlying Bankruptcy and
carries the same initial six digits in the account number.

and Equifax disclosures on the date he applied. Furthermore, there are no accounts appearing on Mr. Haston's credit reports from any of the CRAs showing Chase opened a credit account after he applied.

102.    On or about August 20, 2021, Mr. Haston sent a second online dispute to Experian to dispute the status of the account as being included in the Underlying Bankruptcy. After the initial ACDV was generated, Gold Coast inaccurately verified that Mr. Haston's auto loan was discharged, and reinvestigation results were provided to Mr. Haston from Experian. A true and correct copy of the August 20, 2021, reinvestigation results from Experian are *attached hereto as part of Composite Exhibit "A."*

103.    On or about August 24, 2021, Mr. Haston initiated a phone dispute to Trans Union after he noticed credit information showing the Gold Coast auto loan as closed with comments stating "Chap. 13 wage earner plan account." The phone dispute to Trans Union generated an ACDV that was sent to Gold Coast to dispute the fact that this account was not included in the Underlying Bankruptcy and therefore, not discharged. After the initial ACDV was generated, Gold Coast inaccurately verified that the account was included in bankruptcy and discharged.

104.    On or about August 28, 2021, Trans Union provided the reinvestigation results for his phone dispute, a copy of which is *attached hereto as Exhibit "B."*

105.    On or about August 30, 2021, Mr. Haston submitted a third online dispute to Experian, which generated an ACDV that was sent from Experian to Gold Coast to dispute the status of the account as being included in the Underlying Bankruptcy. After the initial ACDV was generated, Gold Coast inaccurately verified that Mr. Haston's auto loan was discharged, and reinvestigation results were provided to Mr. Haston from Experian. A true and correct copy

of the August 30, 2021, reinvestigation results from Experian are **attached hereto as Exhibit "C."**

106.    On or about September 8, 2021, Mr. Haston applied for a credit card through Capital One Bank USA NA and was approved. Relatedly, a "Hard Inquiry" appears on each of Mr. Haston's credit reports with the CRAs.

*Plaintiff's Written Disputes*

107.    After Mr. Haston's online and phone disputes failed to correct the Inaccurate Information, he began to submit written disputes with supporting documents.

108.    The first set of disputes to the CRAs were sent on or about October 4, 2021. A true and correct copy of the Initial Disputes to the CRAs are **attached hereto as part of Composite Exhibit "D."**

109.    The Initial Disputes called attention to the fact that Mr. Haston's credit reports either hid his payment history for a prolonged period, reported his Gold Coast auto loan as discharged, or both. *See Id.*

110.    Moreover, Plaintiff identified the specific pages of his Underlying Bankruptcy, Amended Plan, and other relevant documents to show he continued to pay Gold Coast directly. Id.

111.    On or about October 14, 2021, Equifax sent Plaintiff the reinvestigation results of his Initial Dispute, which hid more than four years of his payment history. A true and correct copy of Equifax's reinvestigation results are **attached hereto as part of Composite Exhibit "E."**

112.    On or about October 15, 2021, Trans Union sent Plaintiff the reinvestigation results of his Initial Dispute, which removed any mention of a bankruptcy, but still hid more

than four years of his payment history. A true and correct copy of Trans Union's reinvestigation results are **attached hereto as part of Composite Exhibit "E."**

113.    Plaintiff has yet to receive any reinvestigation results from Experian for his Initial Disputes, so he wrote a second letter and resubmitted all information from the Initial Dispute. *See Infra*, ¶115.

114.    Upon receiving the Initial Disputes, the CRAs relayed that correspondence to Gold Coast, who failed to conduct a reasonable investigation, and then furnished inaccurate information to the CRAs.

115.    Gold Coast has been furnishing negative, inaccurate, and/or misleading information (hereinafter "Inaccurate Information") regarding Plaintiff's auto loan to the CRAs. This Inaccurate Information also includes the suppressed payment history of the auto loan.

116.    Because Mr. Haston's payment history remained suppressed he sent a "Second Dispute" dated November 1, 2021, to the CRAs and provided additional documents to support his claims. A true and correct copy of the Second Dispute is **attached hereto as Composite Exhibit "F."**

117.    In the Second Dispute, Mr. Haston included a loan history summary that showed payments from August 3, 2020, to January 15, 2021. Id.

118.    Mr. Haston also provided the oldest available online statement from November 2019 showing his balance at $13,379.03 and his most recently available statement from October 2021 showing his balance had decreased to $4,274.96. Id. Each scheduled payment for the Gold Coast Auto Loan is about $443.56.

119. On or about November 10, 2021, Mr. Haston received reinvestigation results from Equifax for the Second Dispute.  A true and correct copy of the November 10, 2021, reinvestigation results from Equifax are *attached hereto as part of Composite Exhibit "G."*

120. Equifax's reinvestigation results for the Second Dispute showed only four months of his payment history. Id.

121. On or about November 17, 2021, Mr. Haston received reinvestigation results from Trans Union, but the results addressed his line of credit with Gold Coast instead of the Auto Loan. A true and correct copy of the November 17, 2021, reinvestigation results are *attached hereto as part of Composite Exhibit "G."*

122. Once again, Experian failed to provide any reinvestigation results, so Mr. Haston sent a third dispute letter dated December 9, 2021, which reattached the Initial Dispute and all supporting documents. *See infra* ¶122.

123. Similarly, Mr. Haston sent his third set of disputes to the CRAs ("Third Dispute") dated December 9, 2021. A true and correct copy of the Third Dispute is *attached hereto as Composite Exhibit "H."*

124. Mr. Haston's Third Dispute to Equifax mistakenly stated that he did not receive reinvestigation results for his Second Dispute when he did. Despite receiving reinvestigation results for the Second Dispute, the reporting was still inaccurate because of the hidden payment history during the Underlying Bankruptcy.

125. The CRAs reliance on Gold Coast has caused the Inaccurate Information to be sent to third parties who have viewed Plaintiff's credit reports when evaluating his credit worthiness.

126.    The dates when the Inaccurate Information was viewed are reflected as "Regular Inquiries" or "Hard Inquiries" on Plaintiff's consumer disclosures.

127.    On or about December 17, 2021, Plaintiff went to a car dealership known as Land Rover South Dade ("Car Dealer") to finance a new car after his previous car was declared a total loss.

128.    The Car Dealer submitted multiple applications for financing to different lenders. Mr. Haston also tried to get qualified for in house financing. Mr. Haston was denied financing a total of four times by Ally Financial, Land Rover South Dade, TD Auto Finance, and US Bank Southeast.

129.    Plaintiff was ultimately awarded financing by JP Morgan Chase, however multiple inquiries were registered on his credit reports before he was approved, which negatively affected his FICO score. *See supra* ¶26.

130.    Plaintiff's Trans Union disclosure shows "Regular Inquiries" on the following relevant dates in connection with his new car loan:

      a.     US BANK DS SOUTHEAST on December 17, 2021;

      b.     TD AUTO FINANCE on December 17, 2021; and

      c.     LAND ROVER SOUTH DADE on December 17, 2021.

131.    Plaintiff's Experian disclosure shows "Hard Inquiries" on the following dates in connection with his new car loan:

      a.     ALLY FINANCIAL on December 17, 2021; and

      b.     CDK/LAND ROVER SOUTH DADE on December 17, 2021.

132.    Plaintiff's Equifax disclosure shows "Hard Inquiries" on the following dates in connection with his new car loan:

a.      JPMCB – AUTO FINANCE on December 17, 2021;

b.      ALLY FINANCIAL on December 17, 2021; and

c.      LAND ROVER SOUTH DADE on December 17, 2021

133.    One or more of the enumerated "Regular Inquiries" and/or "Hard Inquiries" have resulted in damages to Plaintiff in multiple forms, including economic and non-economic harm.

134.    The Inaccurate Information was published to multiple third parties when considering Mr. Haston's credit applications failed to comply with the industry standards of CDIA/Metro 2, which Defendants have adopted, including but not limited to:

a.      Plaintiff's consumer disclosures falsely report that his Gold Coast Auto Loan was included in his Underlying Bankruptcy and Amended Plan;

b.      The reporting indicates that the CII indicator was reported as "D" instead of blank;

c.      The payment history indicates that Mr. Haston's bankruptcy was falsely reported as either a chapter 11 or chapter 7 bankruptcy;

d.      The reporting indicates that the CII indicator was changed to "H" to indicate the account was discharged instead of blank; and

e.      By reporting a CII indicator of "D" followed by "H" instead of leaving it blank, Plaintiff's positive payment history with Gold Coast was completely suppressed.

135.    Unless and until the Inaccurate Information is no longer a factor in Plaintiff being denied credit, being granted credit at increased rates, losing the opportunity to benefit from credit, or Plaintiff being forced to procure another co-signer to be granted any credit under any terms, these economic losses will continue.

### *Plaintiff's Injuries-In-Fact*

136.    Defendants' actions and omissions have resulted in the improper suppression of Plaintiff's positive payment history on his auto loan, which has negatively affected his FICO Score.

137.    This negative effect on Plaintiff's credit score subjected him to either being denied credit or receiving less favorable credit terms than he otherwise would when he went to Land Rover on December 17, 2021.

138.    This negative effect on Plaintiff's credit score resulted in additional inquiries on Plaintiff's credit report while he was at Land Rover to get qualified for financing, which brought down his score even more.

139.    This negative effect on Plaintiff's credit score created a material risk that based on a false impression of his creditworthiness that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's credit reports when determining if Plaintiff is a credit risk.

140.    Further, courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score

is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14- 01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

<u>**COUNT I – VIOLATIONS OF 15 U.S.C. §1681s-2(b)**</u>
<u>**(AGAINST GOLD COAST FOR DISPUTES TO TRANS UNION)**</u>

141.    Plaintiff incorporates by reference his allegations in paragraphs 1 – 5, 10 – 99a., 103, 104, 106, 117 – 110, 112, 114 – 118, 121, 123, 125 – 130, and 133 - 140 above as if fully set forth herein.

142.    Gold Coast is a furnisher under the FCRA because it provides information concerning consumers to credit reporting agencies.

143.    "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not

furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." *See* 15 U.S.C. §1681s-2(a)(3).

144.    Gold Coast violated 15 U.S.C. §1681s-2(a)(3) by failing to notify Trans Union that Plaintiff was disputing the accuracy or completeness of his auto loan account.

145.    Separate and apart from the failure to note the auto loan account as disputed, Gold Coast violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiff's disputes whether written, online, or by telephone when it failed to review all relevant information.

146.    Additionally, Gold Coast violated §1681s-2(b) by failing to accurately respond Plaintiff's disputes forwarded by Trans Union concerning the account Gold Coast reported.

147.    As a result of GOLD COAST's violations of the FCRA, Plaintiff has been damaged.

148.    Plaintiff's damages include emotional distress associated with the Inaccurate Information, credit denials, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

149.    Gold Coast negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

150.    Additionally, Gold Coast committed a willful violation of the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681n(a).

151.    Plaintiff is entitled to an award of prevail party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Gold Coast in the form of actual damages, statutory damages, punitive damages,

Attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

<strong><u>COUNT II – VIOLATIONS OF 15U.S.C. §1681s-2(b)</u></strong><br><strong><u>(AGAINST GOLD COAST FOR DISPUTES TO EXPERIAN)</u></strong>

152.   Plaintiff incorporates by reference his allegations in Paragraphs 1 – 5, 10 - 99, 99b. – 102, 105 - 110, 113 – 118, 122, 123, 125 – 129, 131, and 133 - 140 above as if fully set forth herein.

153.   Gold Coast is a furnisher under the FCRA because it provides information concerning consumers to credit reporting agencies.

154.   "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." *See* 15 U.S.C. §1681s-2(a)(3).

155.   Gold Coast violated 15 U.S.C. §1681s-2(a)(3) by failing to notify Experian that Plaintiff was disputing the accuracy or completeness of his mortgage account.

156.   Separate and apart from the failure to note the mortgage account as disputed, Gold Coast violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiff's Initial Disputes when it failed to review all relevant information.

157.   Additionally, Gold Coast violated §1681s-2(b) by failing to accurately respond Plaintiff's dispute forwarded by Experian concerning the account Gold Coast reported.

158.   As a result of Gold Coast's violations of the FCRA, Plaintiff has been damaged.

159.    Plaintiff's damages include emotional distress associated with the Inaccurate Information, credit denials, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

160.    Gold Coast negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

161.    Additionally, Gold Coast committed a willful violation of the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681n(a).

162.    Plaintiff is entitled to an award of prevail party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Gold Coast in the form of actual damages, statutory damages, punitive damages, Attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT III – VIOLATIONS OF 15 U.S.C. §1681s-2(b)
## AGAINST GOLD COAST FOR DISPUTES TO EQUIFAX

163.    Plaintiff incorporates by reference his allegations in paragraphs 1 – 5, 10 - 99, 107 – 111, 114 – 120, 123 – 129, and 132 – 140.

164.    Gold Coast is a furnisher under the FCRA because it provides information concerning consumers to credit reporting agencies.

165.    "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." See 15 U.S.C. §1681s-2(a)(3).

166.    Gold Coast violated 15 U.S.C. §1681s-2(a)(3) by failing to notify Equifax that Plaintiff was disputing the accuracy or completeness of his auto loan account.

167.    Separate and apart from the failure to note the mortgage account as disputed, Gold Coast violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiff's Initial Disputes when it failed to review all relevant information.

168.    Additionally, Gold Coast violated §1681s-2(b) by failing to accurately respond Plaintiff's dispute forwarded by Equifax concerning the account Gold Coast reported.

169.    As a result of Gold Coast's violations of the FCRA, Plaintiff has been damaged.

170.    Plaintiff's damages include emotional distress associated with the Inaccurate Information, credit denials, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

171.    Gold Coast negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

172.    Additionally, Gold Coast committed a willful violation of the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681n(a).

173.    Plaintiff is entitled to an award of prevail party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Gold Coast in the form of actual damages, statutory damages, punitive damages, Attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT IV - VIOLATIONS OF 15 U.S.C. §1681i
## (AGAINST TRANS UNION)

174.    Plaintiff incorporates by reference his allegations in Paragraphs   as if fully set forth herein.

175.    At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

176.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

177.    During the relevant time frame, Trans Union received Plaintiff's written, telephonic, and/ or online disputes regarding the accuracy or completeness of the Gold Coast auto loan account appearing on Plaintiff's consumer disclosure.

178.    Trans Union violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

179.    Trans Union unreasonably relied on information provided by Gold Coast, when readily verifiable information that Plaintiff provided in the written, telephonic, and/ or online disputes placed Trans Union on notice that Gold Coasts' information was inaccurate and unreliable.

180.    Trans Union unreasonably relied on information provided by Gold Coast, when readily verifiable information that Plaintiff provided in the written, telephonic, and/ or online disputes ("collective disputes") placed Trans Union on notice that Gold Coast's information was inaccurate.

181.    Trans Union's acts or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

182.    Alternatively, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

183.    As a result of Trans Union's FCRA violations, Plaintiff suffered mental and emotional distress associated with inaccurate information in his credit file, damage to his reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, mental and emotional distress of being denied credit or being granted credit at increased rates, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT V – VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST TRANS UNION

184.    Plaintiff incorporates by reference his allegations in Paragraphs 1 – 4, 6, 9 – 99a., 103, 104, 106 – 110, 112, 114 – 118, 121, 125 – 130, and 133 – 140 as if fully set forth herein.

185.    At all times relevant hereto, TransUnion is and was a "consumer reporting agency" as provided for under the FCRA.

186.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

187.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

188.    Any users of credit reports that viewed the Gold Coast auto loan account saw the Inaccurate Information after Plaintiff's collective disputes.

189.    Trans Union's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

190.    In the alternative, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

191.    As a result of Trans Union's failures to comply with the FCRA, Plaintiff suffered mental and emotional distress associated with inaccurate information in his credit file, damage to his reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, mental and emotional distress of being denied credit or being granted credit at increased rates, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Trans Union in the form of:  Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VI – VIOLATIONS OF 15 U.S.C. §1681i
## (AGAINST EXPERIAN)

192.    Plaintiff incorporates by reference his allegations in paragraphs 1 – 4, 7, 9 - 98, 99b. - 102, 105 – 110, 113 – 118, 122, 123, 125 – 129, 131, and 133 – 140 above as if fully set forth herein.

193.    At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

194.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

195.    During the relevant time frame, Experian received Plaintiff's collective disputes regarding the accuracy of the account reported by Gold Coast on Plaintiff's credit report.

196.    Experian violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

197.    Experian unreasonably relied on information provided by Gold Coast when readily verifiable information that Plaintiff provided in his dispute placed Experian on notice that Gold Coast's information was inaccurate.

198.    Even after Plaintiff's disputes, the Gold Coast account is still being reported with the Inaccurate Information.

199.    Alternatively, if Experian failed to forward any collective disputes as required by the FCRA, then Experian has separately breached its duty to provide "all relevant information" to a furnisher. 15 U.S.C. §1681i(a)(2)(A).

200.    Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

201.    In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

202.    As a result of Experian's violations of the FCRA, Plaintiff suffered mental and emotional distress associated with inaccurate information in his credit file, credit denials, the loss of credit, loss of the ability to purchase and benefit from credit, mental and pain and anguish, damage to his reputation for creditworthiness, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief for Plaintiff and against Experian for: actual damages, statutory damages, punitive damages, attorneys' fees, litigation expenses and costs, and such other relief as the Court deems just and proper.

## COUNT VII – VIOLATIONS OF 15 U.S.C. §1681e(b)
### (AGAINST EXPERIAN)

203.    Plaintiff incorporates by reference his allegations in paragraphs 1 – 4, 7, 9 - 98, 99b. - 102, 105 – 110, 113 – 118, 122, 123, 125 – 129, 131, and 133 – 140 above as if fully set forth herein.

204.    At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

205.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

206.    During the relevant time frame, Experian received Plaintiff's Initial Dispute regarding the accuracy of the account reported by Gold Coast on Plaintiff's credit report.

207.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

208.    Alternatively, if Experian collected the information on its own, its procedures are still not designed to ensure that changes or distinctions in a bankruptcy proceeding are as accurate as possible when appearing in a consumer's credit report.

209.    Any users of credit reports that viewed the Gold Coast account saw the Inaccurate Information.

210.    Even after Plaintiff's Initial Disputes, the Gold Coast account is still being reported with the Inaccurate Information.

211.    Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

212.    In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

213.    As a result of Experian's failures to comply with the FCRA, Plaintiff suffered mental and emotional distress associated with inaccurate information in his credit file, credit denials, the loss of credit, loss of the ability to purchase and benefit from credit, mental and pain and anguish, damage to his reputation for creditworthiness, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury;

Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and Such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VIII – VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST EQUIFAX

214.    Plaintiff incorporates by reference his allegations in paragraphs 1 - 4, 8, 9 – 98, 101, 105, 106 -111, 114 – 120, 123 – 129, and 132 – 140 as if fully stated herein.

215.    At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

216.    At all times relevant hereto, Plaintiff is and was a "consumer" as provided for under the FCRA.

217.    During the relevant time frame, Equifax received Plaintiff's written disputes regarding the accuracy of the Gold Coast Auto Loan on Plaintiff's credit report.

218.    Equifax violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

219.    Additionally, Equifax unreasonably relied on information provided by Gold Coast, when readily verifiable information that Plaintiff provided in his disputes placed Equifax on notice that Gold Coast's information was inaccurate.

220.    Even after Plaintiff's written disputes the Gold Coast account is still being reported with the Inaccurate Information.

221.     Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

222.     In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

223.     As a result of Equifax's violations of the FCRA, Plaintiff suffered mental and emotional distress associated with inaccurate information in her credit file, credit denials, the loss of credit, loss of the ability to purchase and benefit from credit, mental and pain and anguish, damage to her reputation for creditworthiness, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief for Plaintiff and against Equifax for: actual damages, statutory damages, punitive damages, attorneys' fees, litigation expenses and costs, and such other relief as the Court deems just and proper.

## COUNT IX – VIOLATIONS OF 15 U.S.C. §1681e(b) AGAINST EQUIFAX

224.     Plaintiff incorporates by reference his allegations in paragraphs 1 - 4, 8, 9 – 98, 101, 105, 106 -111, 114 – 120, 123 – 129, and 132 – 140 as if fully stated herein.

225.     At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

226.     At all times relevant hereto, Plaintiff is and was a "consumer" as provided for under the FCRA.

227.     During the relevant time frame, Equifax received Plaintiff's written disputes regarding the accuracy of the account reported by Gold Coast on Plaintiff's credit report.

228.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

229.    Any users of credit reports that viewed the Gold Coast account saw the Inaccurate Information.

230.    Even after Plaintiff's written disputes, the Gold Coast account is still being reported with the Inaccurate Information.

231.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

232.    In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

233.    As a result of Equifax's failures to comply with the FCRA, Plaintiff suffered mental and emotional distress associated with inaccurate information in her credit file, credit denials, the loss of credit, loss of the ability to purchase and benefit from credit, mental and pain and anguish, damage to her reputation for creditworthiness, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Equifax in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## JURY DEMAND

234.    Plaintiff demands a trial by jury on all issues so triable.

*Respectfully Submitted,*

SHARMIN & SHARMIN, P.A.
6245 North Federal Hwy, Ste 301
Fort Lauderdale, FL 33308
830 North Federal Highway
Lake Worth, FL 33460
Telephone: 561-291-9109
Fax: 844-921-1022

/s/ Kevin Rajabalee
Kevin Rajabalee, Esq.
FBN: 119948
Email: kevin@sharminlaw.com
Eiman Sharmin, Esq.
FBN: 716391
Email: eiman@sharminlaw.com
*Attorneys for Plaintiff*